[No. C043687. Third Dist. Nov. 9, 2004.]

EBBETTS PASS FOREST WATCH, Plaintiff and Appellant, v.
DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.,
Defendants and Respondents;
SIERRA PACIFIC INDUSTRIES, Real Party in Interest and Respondent.

[No. C043825. Third Dist. Nov. 9, 2004.]

EBBETTS PASS FOREST WATCH, Plaintiff and Appellant, v.
DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.,
Defendants and Respondents;
SIERRA PACIFIC INDUSTRIES, Real Party in Interest and Respondent.

### Counsel

Law Offices of Thomas N. Lippe, Thomas N. Lippe and Michael W. Graf for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Charles W. Getz, Deputy Attorney General, for Defendants and Respondents.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, C. Athena Roussos; Dun & Martinek, David H. Dun and David E. Martinek for Real Party in Interest and Respondent.

## OPINION

RAYE, J.— ■ California law requires timber companies to submit a timber harvesting plan (THP) prior to logging on their land to determine whether the proposed timber harvesting will have significant adverse impacts on the environment. The THP is the functional equivalent of an environmental impact report (EIR) under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

■ Any assessment of potential adverse environmental impacts necessitates a determination of the scope of the area to be considered since the interconnectedness of the ecosystem results in changes to the environment far afield from the logging site itself. The appropriate scope of an assessment area to be considered in evaluating adverse impacts presents a central issue in this case.

Real party in interest Sierra Pacific Industries (Sierra Pacific) submitted six THP's to defendant California Department of Forestry and Fire Protection (Department) for approval. Following a comment period, the Department approved all six plans. Plaintiff Ebbetts Pass Forest Watch (Ebbetts Pass) challenged the approval through a writ of mandamus. Following a court trial, the trial court denied the writ, finding the Department and Sierra Pacific proceeded in the manner required by law and finding sufficient evidence to support the Department's approval of the THP's.

Ebbetts Pass appeals and presents its arguments in ponderous briefs that amble on for almost 200 pages. As appellate courts have at times felt constrained to remark, "Appellant's brief is not brief. It is prolix, rambling and repetitive." (*Wilkinson v. Madera Community Hospital* (1983) 144 Cal.App.3d 436, 441 [192 Cal.Rptr. 593].) This style of writing is unfortunate. Brevity is not only the soul of wit, it is the essence of effective appellate

advocacy and a desirable object in appellate opinions as well. The issues raised by this appeal are complex indeed but not so intricate that 200 pages of exposition are required to explain them. Ebbetts Pass dedicates 26 pages of its opening brief to a "summary" of the arguments. Our summary does not require as much. In brief, Ebbetts Pass contends the Department and Sierra Pacific (1) failed to proceed in the manner required by law by failing to conduct a regional assessment of the cumulative biological impacts of the THP's, particularly impacts on the California spotted owl and the Pacific fisher; (2) failed to appropriately respond to Ebbetts Pass's public comments on the need for a regional cumulative impact assessment; (3) failed to adequately describe the environmental setting of the THP areas; and (4) failed to consider the effects of possible postharvest herbicide applications. After carefully reviewing the record, we find no error and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *The THP Review Process*

In order to fully address the issues presented on appeal, we provide a brief explanation of the THP process. Public Resources Code section 4511 et seq., the Z'Berg-Nejedly Forest Practice Act of 1973 (FPA), governs timber harvesting in California.[1]

The Legislature enacted the FPA to "create and maintain an effective and comprehensive system of regulation and use of all timberlands." (§ 4513.) The FPA seeks to ensure that, where feasible, the productivity of timberlands is restored, enhanced, and maintained, and the goal of maximum sustained production of high-quality timber products is achieved while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment. (§ 4513.)

The FPA vests in the State Board of Forestry and Fire Protection the obligation to adopt forest practice rules and regulations specific to the various forest districts of the state in order to "assure the continuous growing and harvesting of commercial forest tree species and to protect the soil, air, fish, and wildlife, and water resources, including, but not limited to, streams, lakes, and estuaries." (§ 4551.)

Prior to cutting down timber, a company must submit a THP, prepared by a registered professional forester, to the Department for approval. (§ 4581.) The THP must contain a United States Geological Survey map of

---

[1] All further references are to the Public Resources Code unless otherwise noted.

the area showing the location of streams, logging roads, and the boundaries of timberlands to be stocked. The THP also outlines the methods to be used to avoid excessive accelerated erosion from timber operations near streams. (§ 4582, subd. (e).) In addition, the THP must describe the methods of silviculture to be applied. (§ 4582, subd. (d).)[2] The THP also includes a description of the controls used to protect wildlife and an analysis of cumulative impacts. (§ 4582, subd. (i); Cal. Code Regs., tit. 14, § 1034, subd. (w).)

■ The THP preparation and approval process is the functional equivalent of the preparation of an EIR contemplated by CEQA. Though narrower in scope than an EIR, the purpose of a THP is to identify the proposed harvest plan, provide public and governmental decision makers with detailed information on the project's likely effect on the environment, describe ways of minimizing any significant impacts, point out mitigation measures, and identify any alternatives that are less environmentally destructive. (*County of Santa Cruz v. State Bd. of Forestry* (1998) 64 Cal.App.4th 826, 830 [75 Cal.Rptr.2d 393].)

■ In 1991 the Board of Forestry enacted a rule requiring THP's to assess the cumulative impacts to the following resources: watershed, soil productivity, biological, recreation, visual, and traffic. (Cal. Code Regs., tit. 14, § 952.9.) The rule set out "criteria imposed for cumulative impact assessment paralleling the criteria developed for EIR's in CEQA cases." (*East Bay Mun. Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1127 [51 Cal.Rptr.2d 299] (*EBMUD*).) THP's must include information about the pending project and any past, present, and reasonable future projects. (Cal. Code Regs., tit. 14, § 952.9.)

■ Timber companies must submit the THP to the Department for review. The Department reviews the THP for compliance with the FPA and corresponding regulations. (§ 4582.6 et seq.; Cal. Code Regs., tit. 14, § 1037.) The Department considers the potential cumulative impacts of the proposed activity and alternatives to the activity. (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1393–1394 [61 Cal.Rptr.2d 297].) In addition, the Department must also "invite, consider, and respond in writing to comments received from public agencies to which the plan has been transmitted and shall consult with those agencies at their request." (§ 4582.6, subd. (a).) The Department exercises its independent discretion to resolve any disagreements concerning the THP among other agencies. (See *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 711 [270 Cal.Rptr. 650] (*Kings County Farm Bureau*).)

---

[2] Silviculture is the "theory and practice of controlling the establishment, composition, and growth of forests." (Cal. Code Regs., tit. 14, § 895.1.)

■ After submittal, the Department's multi-disciplinary review team independently reviews the THP.[3] The review team helps determine whether the THP conforms to state regulations. The team also aids in an evaluation of potential environmental effects from proposed timber operations. (§ 4582.6; Cal. Code Regs., tit. 14, § 1037.5, subds. (a), (b).)

The review team meets to make an initial determination of whether the proposed THP conforms to the rules. (Cal. Code Regs., tit. 14, § 1037.5, subd. (b).) The review team may perform a preharvest inspection. (Cal. Code Regs., tit. 14, § 1037.5, subd. (g)(1).)

The inspection may result in additional mitigation measures to protect the environment. (Cal. Code Regs., tit. 14, § 1037.5, subd. (f).) In that circumstance, the review team may recommend incorporation of mitigation measures into the plan consistent with the forest practice rules, and which would improve the plan and assist in significantly lessening adverse impacts. (Cal. Code Regs., tit. 14, § 1037.5, subd. (f)(1).) Ultimately, the review team develops a recommendation for the Department's consideration. The advice of review team members must be utilized in determining whether appropriate alternatives have been selected and included in the plan, and whether the plan's implementation would cause significant damage to natural resources. (Cal. Code Regs., tit. 14, § 1037.5, subd. (h).)

Copies of the THP are available to the public, and the public may comment on the contents of the THP. (Cal. Code Regs., tit. 14, § 1037.3.) The review team conducts open public meetings. (Cal. Code Regs., tit. 14, § 1037.5, subd. (d).)

■ Ultimately, the Department determines whether the THP conforms to the rules. (§ 4582.7, subd. (a).) Department approval of the THP results in a notice of approval. The notice of approval includes "a 'written response to significant environmental points raised during the evaluation process,' including those points raised by members of the general public." (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 611–612 [216 Cal.Rptr. 502] (*EPIC I*); § 21080.5, subd. (d)(2)(D).)

■ Approval allows the company to begin timber harvesting. The resulting permit is valid for three years from the date the THP is found to be in conformance. (Cal. Code Regs., tit. 14, §§ 1037.7, 1039.1.)

---

[3] Included in the review team are representatives from the Department of Fish and Game; a county government representative; and representatives from the Regional Water Quality Control Board and the Department of Conservation, Division of Mines and Geology. The Department may call upon other experts such as hydrologists, soil scientists, federal agencies, archaeologists, fire experts, and tribal groups, among others. (Cal. Code Regs., tit. 14, § 1037.5, subd. (a).)

Thereafter, the Department performs periodic inspections of the harvest operation to determine ongoing compliance with the regulations. (§ 4604.) The regulations and the THP set forth the criteria that the Department uses to determine plan approval and compliance. (§§ 4582.75, 4583, 4586 & 4588.)

At the conclusion of harvesting, the company must submit a THP completion report to the Department. (§ 4585.) The Department inspects the site to ensure compliance with the applicable regulations. (§ 4586.) The company must meet standards to ensure the harvested area is restocked with seedlings. (§§ 4587, 4588.)

## II. *Sierra Pacific's THP's*

This appeal is the consolidation of two separate administrative actions filed in El Dorado County and Calaveras County. Each action challenges the approval of three THP's.

### A. *El Dorado THP's*

In the El Dorado County action, Sierra Pacific filed each of the three THP's in the fall of 2000. The Department approved the THP's in February 2001. Ebbetts Pass challenged the approvals.

The Department subsequently rescinded the approvals and reopened public comment, and the trial court dismissed the original litigation as moot. Sierra Pacific submitted additional information on the THP's. Ebbetts Pass submitted timely administrative comments on each of the THP's.

The Department approved the amended THP's in March and April of 2002. Ebbetts Pass filed an administrative mandate action challenging this second approval by the Department.

The THP's at issue in the El Dorado action consist of the Buckshot plan, the Tear plan, and the Stony Deer plan.

The Buckshot plan totals 611 acres. The plan calls for 533 acres to be clear-cut, 35 acres to be selectively harvested, and 43 acres to be commercially thinned. The selected harvesting will retain an average of eight 18-inch trees per acre. The primary vegetation type occurring in all three plan areas is Sierran mixed conifer forest, made up of white fir, ponderosa pine, sugar pine, incense cedar, and Douglas fir. Much of the Buckshot plan area was logged near the turn of the century.

The Tear plan totals 113 acres. Sierra Pacific seeks to clear-cut 105 acres and selectively harvest eight acres. The plan area has been extensively logged.

The Stony Deer plan totals 408 acres. Seventy-five acres are earmarked for clear-cutting, with five acres to be selectively harvested and 328 acres planned for "alternative prescription." The purpose of the alternative prescription is to improve long-term forest health and growing conditions.

Following briefing and oral argument, the trial court denied Ebbetts Pass's writ of mandate. The court issued a lengthy, detailed statement of decision. Ebbetts Pass filed a timely notice of appeal. On April 3, 2003, Ebbetts Pass filed a petition for writ of supersedeas to enjoin harvesting pending a resolution on the merits. On April 23, 2003, we ordered a stay of all timber operations authorized by the THP's.

B. *Calaveras County THP's*

The history of the Calaveras County THP's mirrors that of the El Dorado THP's. They were originally filed in late 2000 and early 2001. The Department originally approved the THP's in June or July of 2001. Ebbetts Pass challenged the approvals. The Department subsequently rescinded the approvals and reopened public comment. Ebbetts Pass submitted comments on each of the plans. Following major amendments, the Department again approved the THP's.

The THP's at issue in Calaveras County consist of the Cuneo Camp plan, the Hazel plan, and the Upper Bailey plan.

The Cuneo Camp plan comprises 306 acres, with 176 acres of clear-cutting, 43 acres of selection harvest, and 49 acres of variable retention. Variable retention refers to harvesting similar to clear-cutting that leaves 1 to 5 percent of trees standing in a given area. The acreage is made up of white and red fir forest with some ponderosa and Jeffrey pine, sugar pine, and incense cedar. The area has been selectively harvested numerous times over the past century.

The Hazel plan totals 167 acres: 14 acres of clear-cutting, nine acres of selection harvest, and 142 acres of variable retention. Sierran mixed conifer and California black oak cover the area. The acreage has also been selectively harvested numerous times over the past century.

The Upper Bailey plan consists of 488 acres: 39 acres of clear-cutting, 38 acres of selection harvest, 88 acres of commercial thinning, and 323 acres of variable retention. The primary vegetation type is Sierran mixed conifer. As with the other two sites, the Upper Bailey acreage has been harvested numerous times over the past century.

Ebbetts Pass filed suit challenging the approvals of the three THP's. Following briefing and oral argument, the court denied the writ. Ebbetts Pass filed a timely notice of appeal and filed a petition for writ of supersedeas to enjoin harvesting until a resolution on the merits. On April 23, 2003, we stayed all timber operations authorized by the THP's. On June 9, 2003, we consolidated the appeals of the El Dorado County and Calaveras County actions.

## III. *Foresting Methods*

Timber harvesting methods fall into two general categories: even-aged management and uneven-aged management. (Cal. Code Regs., tit. 14, §§ 953.1, 953.2.) According to Sierra Pacific, the most common type of even-aged management is clear-cutting; the most common type of uneven-aged management is single tree selection.

Clear-cutting involves cutting all or most of the trees in a specific area, exposing the forest floor to sunlight, and planting a new forest so that the new trees are the same age. (Cal. Code Regs., tit. 14, § 953.1, subd. (b).) Uneven-aged management, such as selection, involves selecting individual trees in a forest and allowing them to replace themselves by natural seeding or by sprouting. (Cal. Code Regs., tit. 14, § 953.2.)

According to the THP's, shade tolerance or intolerance is important for determining the harvesting method to be employed. Various tree species have different tolerances for shade. Many conifers will not grow well in the shade and some will not grow at all. Broadleaf species grow well in shade.

Since Douglas fir trees do not thrive in shade, if Sierra Pacific cuts individual Douglas firs in the area, they may not grow back. Instead, other shade tolerant species will thrive, changing the nature of the forest. Sierra Pacific forests that have not been recently clear-cut and were instead selectively logged for many years have shifted away from conifers requiring substantial sunlight and toward shade tolerant, slow-growing species. In response, Sierra Pacific mixes even-age and uneven-age harvesting methods.

The parties disagree over exactly how extensively Sierra Pacific employs clear-cutting. Ebbetts Pass contends Sierra Pacific intends to clear-cut 70 percent of its timber holdings. Sierra Pacific argues Ebbetts Pass derives its estimates from an unsigned draft document and that the estimates exclude an elevenfold increase in timber acreage owned by Sierra Pacific.

Sierra Pacific adopted a "variable retention" policy to mitigate adverse aesthetic effects from its operations. This policy, incorporated into the THP's,

retains four to eight merchantable trees either in groups or dispersed throughout the timber stands. Instead of clear-cutting, Sierra Pacific leaves some trees to "retain aesthetic values." Sierra Pacific intends to employ this method in 70 percent of its potential future clear-cuts in the Sierras.

## DISCUSSION

### I. *Standard of Review*

We review the Department's approval of the THP's under the mandate procedures established by Code of Civil Procedure section 1094.5. We consider whether the Department abused its discretion in approving the plans. We find an abuse of discretion if the Department failed to proceed in the manner required by law or if the decision is not supported by substantial evidence in the administrative record. Only if the manner in which the Department failed to follow the law is shown to be prejudicial, or is presumptively prejudicial (as when the Department fails to comply with mandatory procedures), must the decision be set aside. (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1235–1236 [32 Cal.Rptr.2d 19, 876 P.2d 505] (*Sierra Club*); *EPIC I, supra,* 170 Cal.App.3d at p. 614, 216 Cal.Rptr. 502; Pub. Resources Code, § 21168.5.)

As in appellate review of approval of an EIR, we do not determine whether the Department was right or wrong or whether another conclusion might be more reasonable. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) Where a party claims an environmental document does not provide enough information, failure to include this information is prejudicial only if it "precludes informed decisionmaking and informed public participation . . . ." (*Kings County Farm Bureau, supra,* 221 Cal.App.3d at p. 712.)

We do not look for an exhaustive analysis, but rather for adequacy, completeness, and a good faith effort at full disclosure. (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836 [29 Cal.Rptr.2d 492].) "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " (*Kleppe v. Sierra Club* (1976) 427 U.S. 390, 410, fn. 21 [49 L.Ed.2d 576, 590, 96 S.Ct. 2718] (*Kleppe*).)

When considering the Department's factual findings, we cannot weigh conflicting evidence or "determine who has the better argument." (*Laurel Heights, supra,* 47 Cal.3d at p. 393.) We resolve reasonable doubts in

the Department's favor. (*Ibid.*) Moreover, we reverse the Department's decision only if, based on the evidence before it, a reasonable person could not reach the Department's conclusion. (*Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 610 [15 Cal.Rptr.2d 779].) Disagreements among experts do not suggest an abuse of discretion on the part of the Department. (*Laurel Heights, supra,* 47 Cal.3d at p. 409.)

## II. *Cumulative Impacts Analysis*

### A. *Introduction*

Ebbetts Pass mounts a two-pronged attack on the Department's analysis of the cumulative impacts of the six THP's. Ebbetts Pass contends the Department failed to proceed in the manner required by law in determining the geographic assessment area. In the alternative, Ebbetts Pass argues no substantial evidence supports the Department's findings regarding cumulative impacts.

This challenge centers on several federal studies and scientific reports that Ebbetts Pass argues mandate a larger geographic assessment area in order to assess cumulative impacts. Under Ebbetts Pass's analysis, the Department, by choosing a smaller geographic area, ignored and failed to utilize relevant, vital information that necessitated a larger geographic area. Since the Department's cumulative impacts analysis depends upon the scope of the area studied, a flaw in the geographic methodology dooms the entire cumulative impacts analysis.

In each THP, Sierra Pacific provided a general description of the biological assessment area. The Buckshot plan, a total of 611 acres, assesses a watershed area consisting of 8,743 acres. The Tear plan, a total of 113 acres, assesses a watershed consisting of 3,437 acres. The Stony Deer plan, a total of 408 acres, assesses a 15,000-acre watershed area. The Cuneo Camp plan, a total of 306 acres, utilizes a watershed assessment area of 18,537 acres. The Hazel plan, a total of 167 acres, adopts a watershed assessment area of 9,281 acres. The Upper Bailey plan, a total of 488 acres, utilizes a watershed assessment area totaling 20,773 acres.

### B. *Programs and Studies*

In order to assess these claims, we present a brief summary of the programs and studies Ebbetts Pass believes the Department discounted or ignored.

### 1. *SOHA Conservation*

The United States Forest Service (Forest Service), in the 1980's, implemented a spotted owl habitat area (SOHA) conservation strategy to ensure the viability of the spotted owl population. Each SOHA is capable of supporting one to three pairs of owls, separated from each other by distances of six to 12 miles.

### 2. *1992 Report*

In 1992 the Forest Service produced a report titled The California Spotted Owl: A Technical Assessment of Its Current Status (1992 Report) that recommended a series of measures to ensure short-term viability while the Forest Service formulated a long-term management plan. The 1992 Report found spotted owls prefer nesting and foraging in dense old-forest habitat, consisting of large trees, snags, and downed wood material.[4] The owls also preferred high canopy cover and multi-story canopies.

The 1992 Report stated the "greatest concern to us at this time is the rapid disappearance of the large, old, and generally decadent trees that are the focus of nesting by spotted owls." The 1992 report also found the practice of isolating SOHA's from each other ineffective to protect the owls. According to the 1992 Report: "[w]e expect that owl pairs in SOHAs would disappear at a relatively high rate, leaving the SOHAs unoccupied and at least temporarily nonfunctional."

The 1992 Report described the importance of dispersal to spotted owl viability: "Successful dispersal is essential for population viability. Without it, a population will slowly decline to extinction, because deceased individuals in the breeding population will not be replaced by recruits from dispersing juveniles or adults that have been displaced or have not yet secured a territory. . . . 'The distance between adjacent pairs or groups of breeding owls should be such that dispersal of juveniles can replace losses (deaths or emigrations) among existing pairs and provide for colonization of suitable, unoccupied habitats.' "

The 1992 Report also expressed concern with areas in the Sierra Nevada that formed potential "bottlenecks in distribution where even relatively small losses of habitat could sever the interchange between adjacent populations of owls." The report designated these areas as "areas of concern," characterized by habitat fragmentation "that decreases the density of owl pairs, makes successful dispersal more difficult, and reduces the likelihood of quick replacement of owls in vacated habitat."

---

[4] Snags are standing dead trees utilized by wildlife for nesting, roosting, and resting.

The 1992 Report designated two areas of concern, areas 4 and 5, located in El Dorado and Calaveras counties. These areas are within the purview of the THP's. The report described these areas as "[c]heckerboarded lands and large, private inholdings" in which owl densities were unknown on some private lands and were very low on other private lands. According to the report, "much [private land] acreage has habitat suitable for spotted owls" but "existing State regulations do not assure maintenance of owl sites on private lands. The difference lies in the different policies and practices of individual land owners."

To offset this problem, the 1992 Report recommends that: "A. [Plans developed by private companies to maintain breeding populations of spotted owls] should clearly identify how resulting forest structures and configurations are likely to provide owl habitat, as it is presently understood, or additional information presently known only to a given timber company should be made public, in detail, for evaluation. [¶] B. Approval of a plan by the State Board of Forestry would be contingent upon the concurrent implementation by the timber company of a long-term demographic study . . . over a large enough sample of its ownership to determine whether or not its management leads to predicted results. Such a demographic study would follow the same standards and protocols already established for spotted owls, and results would be open for scrutiny, at any time, by the public."

### 3. *CASPO Guidelines*

In response to the 1992 Report, the Forest Service in 1993 replaced the SOHA strategy with the California Spotted Owl Sierran Province Interim Guidelines (CASPO guidelines). The CASPO guidelines were to remain in effect for two years until the adoption of a long-term strategy for spotted owl management. The CASPO guidelines established 300-acre protected activity centers around all spotted owl nest sites in which no logging would occur. The CASPO guidelines also limited removal of trees preferred or utilized by owls for nesting.

### 4. *SNEP Report*

In 1996 the federally funded Sierra Nevada Ecosystem Project issued a report to Congress discussing the need for preservation of owl habitat on a regional basis.

### 5. *FEIS*

The Forest Service commissioned three spotted owl demographic studies in 1998 and 1999 covering the Sierra Nevada. The studies found spotted owl populations have been declining in the Sierra Nevada.

In January 2001 the Forest Service issued a Final Environmental Impact Statement (FEIS) on the amendment of 11 forest land and resource management plans in the Sierra Nevada.

The FEIS noted the importance of assessing impacts to species on a regional level: "At the landscape scale the issue is to provide for sufficient amounts and distribution of high quality habitat to facilitate natal and breeding dispersal among territories and to maintain California spotted owls well-distributed throughout their historic range in the Sierra Nevada. For this purpose, protecting occupied, as well as suitable but unoccupied habitat, over the long-term is important at this scale. A species with obligate dispersal and experiencing habitat limitation would be expected to show a pattern of less than full occupancy of habitat due to the uncertainty of the search process and the survival costs associated with searching for low-density habitat [citation]. Conservation efforts should therefore consider not only occupied habitat, but also suitable unoccupied habitats, in developing conservation strategies for species for which dispersal may function as a primary limiting factor [citation]."

In addition, the FEIS discussed areas of concern consisting of bottlenecks in distribution of owls, gaps in known distribution, locally isolated populations, highly fragmented habitat, and areas of low density. The FEIS noted: "These areas of concern were thought to indicate potential areas where future problems may be greatest if the owl's status in the Sierra Nevada were to deteriorate. They represent areas where management decisions may have a disproportionate potential to affect the California spotted owl population. Of particular concern are areas of checkerboard ownership and large inclusions of non-federal lands which occur on the Tahoe, El Dorado, and Stanislaus national forests. Habitat projections in areas of checkerboard ownership are highly uncertain and the existing condition is often highly fragmented. The risk and uncertainty associated with maintaining a well-distributed population is certainly higher within these areas of concern."

The FEIS also noted the impact of accelerated harvesting on the owl: "Of these concerns, significant changes in diameter distributions of trees in the Sierra Nevada and rapid reductions in the distribution and abundance of large, old, and decadent trees posed the greatest threat to the California spotted owl [citation]. This factor relates to two other factors—the decline in snag density and loss of large-diameter logs. The diameter of nest trees selected by owls in the Sierra Nevada is significantly greater than the average diameters of conifers in the Sierra Nevada. Large trees suitable for owl nesting contribute to the overall quality of owl habitat. Large trees become future large snags and large downed logs, the latter providing important habitat attributes for some prey species. The length of time required to

recover old trees and increase their density over the landscape raises the level of concern associated with their decline."[5]

## C. *Determination of Assessment Area*

Ebbetts Pass complains the geographic area selected by the Department is too small to fully consider cumulative impacts. By limiting its review to information pertaining to the inappropriately truncated assessment area, the Department disregarded other relevant information necessary to identify significant environmental effects. According to Ebbetts Pass, uncontroverted evidence establishes that the biological assessment areas selected by Sierra Pacific are inadequate to determine the impact of timber harvesting on the spotted owl; obedience to federal forest practice rules and federal scientific studies would compel a larger, regional assessment area.

Under the regulations, "[c]umulative impacts shall be assessed based upon the methodology described in Board Technical Rule Addendum Number 2, Forest Practice Cumulative Impacts Assessment Process and shall be guided by standards of practicality and reasonableness. The [registered professional forester's] and plan submitter's duties under this section shall be limited to closely related past, present and reasonably foreseeable probable future projects within the same ownership and to matters of public record." (Cal. Code Regs., tit. 14, § 898.)

The regulations indicate the determination of the assessment area will depend on the specific facts before the Department. The assessment area will vary based upon the particular project. As "Board Technical Rule Addendum Number 2, section C" notes: "Biological assessment areas will vary with the species being evaluated and its habitat. . . ." (Cal. Code Regs., tit. 14, § 952.9, Technical Rule Addendum No. 2.) Contrary to Ebbetts Pass's suggestion, the regulatory scheme does not require the Department to automatically consider information that would be provided by using a larger geographic area.

The Supreme Court in *Kleppe* addressed the selection of an assessment area in the coal mining context. In *Kleppe*, environmental groups challenged

---

[5] Sierra Pacific requests judicial notice of "Sierra Pacific Industries Option A Demonstration of Maximum Sustainable Production, dated January 1, 1999, and approval by the California Department of Forestry and Fire Protection dated August 20, 2002" (the Option A document). Sierra Pacific contends we may take judicial notice pursuant to Evidence Code section 452, subdivision (c) as an official act of the legislative, executive, and judicial departments of the United States. Ebbetts Pass does not object to consideration of the Option A document to determine the reasonableness of the geographic assessment area. We take judicial notice of the Option A document for this limited purpose.

federal agencies responsible for developing coal reserves on federally owned or controlled land. Plaintiffs sought a declaration that the agencies were required to prepare a regionwide, comprehensive environmental impact statement. (*Kleppe*, *supra*, 427 U.S. at pp. 394–396.)

The Supreme Court disagreed, finding: "The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. [Citation.] Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." (*Kleppe*, *supra*, 427 U.S. at p. 412.)

 The environmental plaintiffs argued the coal-related projects would produce a wide variety of cumulative environmental impacts throughout the Northern Great Plains region. They alleged diminished water availability, water and air pollution, population increases, and possible climatic changes. (*Kleppe*, *supra*, 427 U.S. at p. 413.) The *Kleppe* court responded: "[D]etermination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." (*Id.* at p. 414.)

The court noted the agencies disputed the environmental groups' contentions that the interrelationship of environmental impacts was regionwide. Instead, the agencies determined that the appropriate scope of comprehensive impact statements should be based on basins, drainage areas, and other factors. The court found: "We cannot say that [the agencies'] choices are arbitrary. Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements." (*Kleppe*, *supra*, 427 U.S. at p. 414.)

We find *Kleppe* answers Ebbetts Pass's contention that the Department failed to proceed in the manner required by law in determining the geographic assessment area. The selection of the assessment area is left to the Department's expertise, and absent a showing of arbitrary action, we must assume the Department exercised its discretion appropriately.

Our review of the voluminous administrative record reveals extensive discussions concerning the appropriate assessment area in both the THP's and

the Department's responses to public comment. A section of the Tear THP entitled "General Considerations When Choosing Assessment Areas" provides the rationale for selecting the assessment area.[6]

According to the Tear THP, "Use of a large assessment area, like the Sierra Nevada Modoc Plateau region could serve to dilute any impacts estimated to insignificance. [¶] On the other hand, if the assessment area were too small, (say one acre), minor impacts could be viewed as long-term, significant adverse impacts; until they are viewed in a proper scale one cannot tell if they are truly significant. It is in this context that we continue to carefully choose the assessment areas for each THP."

In the official response of the Department to environmental issues raised during the THP evaluation process (response), the Department also tackled the issue of assessment areas. The response framed the issue: "There was a concern that the THP fails to use a biological assessment area broad enough to account for the impacts of SPI's logging plans throughout the Sierra Nevada. By limiting the assessment of biological impacts of each of SPI's timber harvest projects to individual watersheds, CDF is unable to ensure that fragmentation of habitat on a regional scale will not occur. The biological assessment area must be defined to include the entire Sierra Nevada ecosystem, so as to include the entire range of the California spotted owl and the historical range of the Pacific fisher's Sierra Nevada population, as well as all of SPI's foreseeable projects in the Sierra Nevada."

The Department responded: "Given the guidance in the [technical] rules . . . , it does not appear to CDF that an analysis of impacts from SPI logging for an assessment area the size of the entire Sierra Nevada would be 'practical or reasonable' within the framework of considering approval of [the] THP . . . . Likewise, CDF finds that the information that would be needed to make such an assessment of the impacts on an area the size of the entire Sierra Nevada is not reasonably available prior to the submission of [the] THP . . . , which is the project that is under consideration at this time. And third, the company appears to know only in very general terms . . . their plans for the foreseeable future, and there are not enough specifics to be able to make a through [sic] analysis of impacts throughout an area the size of the entire Sierra Nevada, although there is enough information available to make a determination of the cumulative impacts on an area the size of the [THP] assessment area . . . . A fourth factor is that an analysis of the impacts for the entire Sierra Nevada would not be complete . . . by just using the information known on lands owned by the plan submitter. There are countless other land use decisions being made and changed all the time on other private and

---

[6] While the Tear THP is quoted in this portion of the Discussion, its contents are representative of the contents of the other THP's under consideration.

public land holdings within an assessment area the size of the entire Sierra Nevada. . . . A fifth factor is that the size of an area to be analyzed for cumulative impacts should not be so large as to cause the particular THP project under discussion to be lost and the impacts of that particular THP to be so small as to disappear. There is also no information, with respect to biological impacts of certain birds or animals, that individuals of these species that might be impacted by [the] THP . . . would be known to travel great distances so that they would be impacted by activities that occur a hundred or more miles away in another portion of the Sierra Nevada. A biological assessment area that is so large as the entire Sierra Nevada would not therefore be helpful in assessing the significant adverse cumulative impacts . . . ."

■ Given the record before us, we find the Department proceeded in the manner required by law in evaluating Sierra Pacific's choice of an assessment area for its cumulative impact analysis. The Department neither ignored federal scientific studies nor failed to respond to Ebbetts Pass's comments.

Ebbetts Pass argues the Department's flawed choice of an assessment area led it to ignore reasonably obtainable information necessary to determine the significance of environmental effects. In support, Ebbetts Pass relies on *Sierra Club, supra*, 7 Cal.4th 1215.

In *Sierra Club*, a lumber company submitted two THP's covering old growth forest to the Department. In response to a request by the Department of Fish and Game, the Department asked the lumber company to provide information on old-growth-dependent wildlife species within the plan areas. The lumber company refused to provide the requested information, arguing it was not specified in the rules promulgated by the Board of Forestry. The Board of Forestry ultimately approved the THP's, finding no significant adverse effect on old-growth-dependent species from harvesting under the plans. (*Sierra Club, supra*, 7 Cal.4th at p. 1219.)

The Supreme Court found the Board of Forestry abused its discretion when it evaluated and approved the THP's on the basis of a record that lacked information regarding the presence of some old-growth-dependent species, information both the Department and the Department of Fish and Game had determined was necessary. (*Sierra Club, supra*, 7 Cal.4th at pp. 1220, 1235–1236.) The court reasoned: "The record confirms that Fish and Game had reasonably determined that the proposed timber harvest could have a significant adverse effect on the old-growth-dependent wildlife habitat. Therefore, the board, through the department, had an obligation imposed by CEQA to collect information regarding the presence of old-growth-dependent species on the site of the proposed timber harvest. Without that information the board

could not identify the environmental impacts of the project or carry out its obligation to protect wildlife as required by the Forest Practice Act [citation], and to prevent environmental damage by refusing to approve projects if feasible mitigation measures are available which will avoid or substantially lessen significant environmental effects as required by CEQA. [Citations.] When it nonetheless approved the plan, the board failed to proceed in the manner prescribed by the Forest Practice Act and CEQA." (*Id.* at p. 1236.)

Ebbetts Pass argues the THP's before us present a similar situation. We disagree. In the present case, no agency has requested or even suggested the need for additional information regarding cumulative environmental impacts. Instead, the Department had before it the vast stockpile of information amassed by Ebbetts Pass and Sierra Pacific.

Ebbetts Pass attempts to transform the information it suggests would result from a larger geographic area into the type of information found lacking by the Supreme Court in *Sierra Club*. We are not persuaded. In *Sierra Club*, the agency charged with evaluating the THP requested specific information it believed necessary for making an informed decision. To proceed without this information constituted an abuse of discretion. Here, no agency felt compelled to request more information. Indeed, the information Ebbetts Pass believes mandates a larger assessment area was before the Department and is part of the administrative record.

According to Ebbetts Pass, uncontroverted evidence shows the biological assessment areas selected by Sierra Pacific are inadequate to determine the impact of timber harvesting on the spotted owl. Ebbetts Pass interprets the federal Forest Service studies discussed above as requiring a regional assessment of impacts, not an assessment based on various watersheds.

However, as Sierra Pacific points out, the federal studies are far from unanimous on the issue. The 1992 Report acknowledged: "Because we lack a full understanding of all attributes that comprise suitable owl habitat, however, we cannot determine the exact amount of suitable habitat for the owls on any ownership." The 1992 Report also noted the population and distribution of spotted owls at the time of the study "do not suggest that they have declined either in their overall distribution in the Sierra Nevada or that they have declined markedly in abundance within any forest type." The 1992 Report did not recommend setting aside forest areas as habitat conservation

areas. In addition, the 1992 Report found it impossible to conclude, if the owl population had declined, whether the decline resulted from changes in the amount or quality of available habitat or because of drought conditions.[7]

Sierra Pacific also challenges Ebbetts Pass's reliance on the FEIS. The FEIS notes: "Information on the historic distribution, abundance, and habitat associations of California spotted owls in the Sierra Nevada is unavailable [citation]. Thus, it is not possible to determine how current population numbers and distribution may have changed relative to historic conditions." The FEIS echoes this uncertainty over the owl population at several points.

Our review of the administrative record does not substantiate Ebbetts Pass's assertion that a regional assessment area is mandated by the federal studies. The FEIS posits the question, "How many acres are in a landscape?" The FEIS proposes areas "generally 30,000 to 50,000 acres" be analyzed. However, the FEIS does not explain the derivation of this figure, nor does it state that this acreage should be employed in cumulative impacts analysis. The documents Ebbetts Pass believes unequivocally call for a regional study also acknowledge a dearth of information about the population and habitat of the spotted owl.

### D. Consideration of Information from Federal Agencies

Ebbetts Pass also challenges the Department's consideration of the information generated by the Forest Service and other federal agencies. According to Ebbetts Pass, the Department failed to proceed in the manner required by law by failing to consider or utilize information regarding the need for a regional assessment area.

We disagree. The administrative record reveals the Department considered information from the Forest Service and other federal sources in assessing significant adverse impacts, either incremental or cumulative, on wildlife. All of the studies cited by Ebbetts Pass as mandating a larger assessment area are included in the administrative record.

The Department responded to Ebbetts Pass's comments concerning the federal studies. These responses specifically reference the federal studies in conjunction with discussions of silviculture methods, spotted owl habitat, assessment areas, and Pacific fisher habitat.

---

[7] Ebbetts Pass makes frequent mention of the "areas of concern" discussed in the 1992 Report. However, the areas of concern were "potential areas where future problems may be greatest if the owl's status in the Sierra Nevada were to deteriorate." The areas of concern denote the possibility, not probability, of problems for spotted owl viability.

However, Ebbetts Pass argues: "While [the Department] has the discretion to reach a conclusion that is different from that of the Forest Service regarding the geographic scale necessary to assess the THPs' cumulative impacts, [the Department] must do so based on the evidence. Instead, [the Department] did so based on its own administrative fiat, consisting of a series of findings/responses to comments that are not based on evidence at all, but consist of erroneous legal interpretations or unsupported conclusions."

■■■ We disagree with Ebbetts Pass's assessment of the record. The Department's responses are neither erroneous legal interpretations nor unsupported conclusions. The Department was not required to adopt the federal studies or to slavishly adhere to their findings. The federal studies do not establish an evidentiary benchmark by which we measure the Department's findings. Our role is to determine whether the Department complied with the process in a manner sufficient to make an informed decision. (*Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 355 [182 Cal.Rptr. 317].) We find the Department adequately considered all the information before it prior to approving the THP's.

### E. *Responses to Public Comment*

According to Ebbetts Pass, the Department failed to meaningfully respond to public comments regarding the need for a regional cumulative impact assessment. In particular, Ebbetts Pass challenges the Department's response to its comment that the Department must include Forest Service information in its own cumulative impacts assessment and utilize a regional cumulative impact of logging as the Forest Service does for its timber sales. Ebbetts Pass charges the Department rejected its comments "based on a number of factual and legal assertions, all of which are without merit."

The insufficiency of the Department's responses to environmental objections may be grounds for the issuance of a writ of mandate to set aside a decision approving a THP. (*Gallegos v. State Bd. of Forestry* (1978) 76 Cal.App.3d 945, 952–955 [142 Cal.Rptr. 86] (*Gallegos*).) In interpreting an analogous requirement under CEQA, courts have held that the public agency must provide, in the final EIR, "written responses that evince a good faith and reasoned analysis why specific comments and objections were not accepted. The public agency need not respond to every comment raised in the course of the review and consultation process, but it must specifically respond to the most significant environmental questions raised in opposition to the project." (*Id.* at p. 954.) The public agency must describe the disposition of each of the significant environmental issues raised and must particularly set forth in detail

the reasons why the particular comments and objections were rejected and why the agency considered the development of the project to be of overriding importance. (*Ibid.*)

"The purpose of this requirement is to provide the public with a good faith, reasoned analysis why a specific comment or objection was not accepted. For this reason, conclusory responses unsupported by empirical information, scientific authorities or explanatory information have been held insufficient to satisfy the requirement of a meaningful, reasoned response: conclusory responses fail to crystallize issues, and afford no basis for a comparison of the problems caused by the project and the difficulties involved in the alternatives." (*EPIC I, supra*, 170 Cal.App.3d at p. 628.)

In *Gallegos*, the court found the State Board of Forestry abused its discretion by failing to respond to numerous specific comments and objections made by interested agencies and private groups. The responses the agency did provide were conclusory. For example, the agency baldly stated the amended plan should adequately mitigate any adverse effects upon the water system, and the plan conformed with the fire protection requirements of the FPA and rules. (*Gallegos, supra*, 76 Cal.App.3d at p. 954.) The court found these responses totally conclusory and an inadequate response to the significant environmental points raised during the evaluation process. (*Ibid.*)

In *EPIC I, supra*, 170 Cal.App.3d, the court found the agency's responses inadequate because they contained no analysis of the potential danger to an archaeological site. The response contained no specific information as to the basis for rejecting the objection. The response referred to a draft report relied upon by unknown archaeologists and referred to the final report as "forthcoming." The court found the reference to a report of unknown content, where the agency refused to divulge the report, could not constitute a sufficient answer to an environmental objection. (*Id.* at pp. 628–629.)

Our review of the administrative record shows the Department satisfied its obligations to respond to comments and objections under both *Gallegos* and *EPIC I*. Here, unlike the agency in *Gallegos*, the Department did not address only one or two issues raised by the comments and objections presented. Instead, the Department provided lengthy responses to all 22 issues raised by the comments.

Nor did the Department give conclusory responses. The Department's responses each contain a brief, accurate description of the issue raised. To each issue the Department provides detailed reasons why each comment or objection was rejected. The Department supported each response with empirical information, scientific authorities, and explanations.

For example, in response to objections as to the size of the assessment area, the Department provided a nonconclusory discussion of the factors that led it to reject the concept of an assessment area the size of the Sierra Nevada as impractical. The Department cited the unavailability of data or information concerning projected and existing land uses throughout the region, independent actions of cities and counties, the actions of private landowners, and the diminution of impacts of the THP in such a large assessment area as the bases for its rejection of a Sierra Nevada-wide regional assessment area. We find the Department proceeded in the manner required by law by adequately responding to public comment.

### F. Assessment of Local Cumulative Impacts

In addition to challenging Sierra Pacific's choice of assessment area, Ebbetts Pass also challenges the substance of the analyses in the THP's of local cumulative impacts. Ebbetts Pass also criticizes the Department's finding that the THP's would have no reasonable potential to cause or add to significant cumulative impacts.

In challenging the assessment of cumulative impacts, Ebbetts Pass presents the same two-pronged argument it presented against the selection of an assessment area: Sierra Pacific and the Department failed to proceed in the manner required by law, and substantial evidence does not support the findings. Again, Ebbetts Pass accuses the Department of ignoring pertinent and contrary federal studies and failing to respond to critical comments.

In essence, Ebbetts Pass reiterates many of the same arguments set forth in opposition to the assessment area. Again, Ebbetts Pass quotes copiously from federal forestry studies it believes support its assertion that the THP's will deprive the spotted owl of habitat necessary to survive. Again, Ebbetts Pass accuses the Department and Sierra Pacific of failing to consider these studies.

The Board of Forestry has adopted a cumulative impacts assessment checklist for professional foresters to use when submitting THP's. (Cal. Code Regs., tit. 14, § 952.9, Technical Rule Addendum No. 2.) The professional forester must identify: (1) past, present, or reasonably foreseeable probable future projects that may affect resources in the assessment area; (2) continuing, significant adverse impacts from past land use activities that may add to the impacts of the proposed project; (3) cumulative impacts from the proposed project, in combination with past, present, and reasonably foreseeable future projects; and (4) mitigation measures or alternatives. (Cal. Code Regs., tit. 14, §§ 912.9, 952.9.)

The regulations also require the Department to supplement as needed the cumulative impacts of the plan upon the environment. (Cal. Code

Regs., tit. 14, §§ 898, 912.9.) "However, in THP's, just as in EIR's prepared under CEQA, assessment of cumulative impacts are guided by standards of practicality and reasonableness; there is no one prescribed mode of analysis." (*EBMUD, supra*, 43 Cal.App.4th at p. 1127.)

The section on cumulative impacts in the Tear THP acknowledges spotted owl activity in the area and proceeds to discuss scientific and forestry studies regarding the owl population.[8] The Tear THP cites demographic studies that find little correlation between timber harvesting and a decrease in the owl population. Despite a marked reduction in old-growth forest, enough very old trees remain to maintain a consistent distribution of owls.

The Tear THP also addresses the "areas of concern" located within the harvest area. The areas of concern denote potential habitat fragmentation that might result in a decrease in the density of owl pairs. The Tear THP states: "This THP provides protection for all known California spotted owl sites through site specific mitigation. This site specific mitigation will prevent any reduction in the density of owl pairs and will not increase the difficulty of dispersing between territories."

The Tear THP cites scientific studies that comport with timber industry studies finding at least half the nesting owls nest in timber stands of small saw timber and do not appear to require old growth for successful nesting. Owls "often nest in large individual trees located in small sawtimber stands." Sierra Pacific asserts its management practices will increase the number of nest trees.

The Tear THP also notes: "Owl nesting habitat and foraging habitat is likely to remain stable for the foreseeable future and will increase from an average of 20% to over 50% of SPI lands over the planning horizon." Sierra Pacific's management "will produce more large trees, and there will be more nesting habitat. With the use of evenaged regeneration systems, we will create interspersed types, which meet this species' edge needs. With our new variable retention policy for the reduction of the visual effects of clear cuts, we still expect to create increased average tree size while maintaining the edge effect."

The Tear THP concludes by finding: "Based upon our current knowledge of this species' habitat needs, and the conditions of our forests today, over time our management will improve habitat conditions for the California spotted owl on our land. Post harvest this planning watershed will maintain [California spotted owl] nesting and other vegetation type edges . . . . Given

---

[8] See footnote 6, *ante*, at page 1352.

this information, our proposed management is unlikely to cause short or long-term significant adverse effects on the habitat available for the California spotted owl."

The Department considered Sierra Pacific's finding of no significant impacts and the supporting evidence and reached the same conclusion. The Department noted: "Among the many factors considered was research that has found that a significant percentage of the known spotted owl nesting locations on federal land are found in small sawtimber (40%); that even-aged management will grow such small sawtimber, as can be seen throughout the Sierra as a result of even-aged timberstands that were created as a result of fire or harvest by man; that despite 100 years of logging activity, there are still owls present on private timberlands; that SPI lands are not classified as late seral or late successional by definition, yet owls are present; principle that each successional stage of a Sierran mixed conifer forest provides habitat elements utilized by some species; that this project represents a small percentage of the assessment area; that federal forest lands are being managed with less disturbance from logging than was present in the recent past; and that most of the SPI lands are well interspersed with a mixture of private and public ownerships."

The Department's review included analyzing the information provided by Sierra Pacific as well as additional information, including Forest Service documents. The Department stated it also considered "the best available information from all sources including Federal information and new research."

Our review of the THP's reveals the Department did not, as Ebbetts Pass insists, ignore relevant information provided by federal studies.

In addition, although Ebbetts Pass contends both the Department and Sierra Pacific failed to respond to comments concerning cumulative impacts, Ebbetts Pass quotes extensively from the detailed replies provided by Sierra Pacific. This extensive discussion belies Ebbetts Pass's claim that the Department and Sierra Pacific inadequately addressed the concerns reflected in Ebbetts Pass's comments regarding cumulative impacts.

Since we find the Department proceeded in the manner required by law in assessing the cumulative impacts, we next consider whether substantial evidence supports the Department's finding of no substantial impact. Ebbetts Pass contends that Sierra Pacific "argues that its management will retain important old-forest habitat elements such as large trees, snags, downed woody material, hardwoods and multi-story canopy. The record, however, does not contain evidence that SPI's even-aged management system will

retain and allow for the future recruitment of old-forest habitat on these plans. Thus, [the Department] abused its discretion in finding no significant impacts for these THPs."

Ebbetts Pass contends the record contains uncontroverted evidence that owls and other forest-dependent species require habitats that are eliminated by even-aged management with harvest rotation cycles under 100 years. However, Sierra Pacific disputed many of the conclusions Ebbetts Pass labels "uncontroverted." Sierra Pacific argued owls can survive in younger forests and that edge habitat will benefit owls, and cited a study in support of its argument. Ebbetts Pass claims other authorities contradict these claims. Ebbetts Pass also criticizes Sierra Pacific's reliance on a 2000 study of northern spotted owls, arguing the study's findings were tempered by analysis in the FEIS.

Ebbetts Pass's objections amount to a disagreement over which authorities to follow and which studies to cite. The scientific evidence is not as definitive as Ebbetts Pass suggests. Instead of black and white, the studies of the future of the spotted owl population present varying shades of gray.

G. *Herbicide Use*

Finally, Ebbetts Pass argues both Sierra Pacific and the Department failed to adequately assess the impacts of herbicide use for each THP. Once again, our review of the administrative record reveals both Sierra Pacific, in the THP's, and the Department, in its responses to comments, extensively discussed the issue of herbicides.

Timber harvesters use herbicides to temporarily deter growth of competing plant species in an effort to provide conifer seedlings a chance to establish themselves. Sierra Pacific stated it believed "the use of herbicides is entirely too speculative to be considered as part of a THP project." However, because "there exists a reasonable probability that some form of herbicide may be used to control vegetation post-harvest," Sierra Pacific provided a lengthy discussion of potential impacts.

In its official response to comments, the Department provided an extensive discussion of the potential use of herbicides. The Department also found the specific details of herbicide application to be "speculative." The comment continues: "However, certain generalities can be made on this issue based on past practices from the THP applicant. CDF has taken into consideration these past practices, which have typically included spraying of one of six different herbicides to control brush competition . . . in determining what the likely impacts would be from herbicide use on these lands." The Department proceeded to discuss each herbicide and its attendant potential impacts in detail.

The Department concludes it "does not find that there is substantial evidence of significant adverse environmental impacts from use of these registered materials if they are used in accordance with existing labeled precautions." According to the Department, herbicide use could "provide for a reduction in competition for conifer seedlings so that they may be able to grow more rapidly thereby helping to meet the legislative goal of maximum sustained production of high-quality forest products while giving consideration to the other forest values."

In addition, the Department notes any future use of herbicides by Sierra Pacific must be in accordance with appropriate and applicable law, including the California Department of Pesticide Regulations (DPR). The DPR administers a regulatory program certified pursuant to section 21080.5. (Cal. Code Regs., tit. 14, § 15251.)

Ebbetts Pass mounts several challenges to the adequacy of both Sierra Pacific's and the Department's responses to the issue of future pesticide use. We find no merit to these contentions.

Ebbetts Pass accuses Sierra Pacific of impermissibly segmenting the project, attempting to cordon off herbicide use as a separate project immune from analysis under the THP. However, this argument ignores the lengthy discussions by both Sierra Pacific and the Department concerning the potential use of herbicides and the possible impacts. Neither entity ignored or put off the issue for future consideration.

Ebbetts Pass also claims the Department relied solely on the state and federal herbicide registration process in determining that potential herbicide use would not result in significant adverse environmental impacts. The record belies this claim. Both Sierra Pacific and the Department extensively discussed the particular pesticides that might be used, including potential environmental impacts.

The use of herbicides by Sierra Pacific will be evaluated in the context of a specific setting under the regulatory program for the certification and use of pesticides, including herbicides. (Cal. Code Regs., tit. 14, § 15251, subd. (i).) The review and issuance of appropriate permits will be required.

Ebbetts Pass implies future herbicide application will occur without restriction. However, the Tear THP states the decision to use any herbicides "will be made by a licensed Pest Control Advisor using licensed pest control operators

under the jurisdiction of the California Department of Food and Agriculture and the State Office of Pesticide Regulation."[9]

Ebbetts Pass faults the Department for not requiring more specific information on postharvest herbicide use in each THP. According to Ebbetts Pass, the failure to require more specific information constituted an abuse of discretion under *Sierra Club*. In *Sierra Club*, the Supreme Court found an abuse of discretion in the Board of Forestry's approval of THP's despite an unfulfilled request for information on old-growth-dependent wildlife species. (*Sierra Club, supra*, 7 Cal.4th at pp. 1235–1236.)

Here, however, the Department did not approve the THP's in the face of incomplete information. The use of pesticides ultimately depends on site-specific information obtainable only after the harvest. Any specific information obtained prior to harvest remains pure speculation, as the Department found.

In addition, Ebbetts Pass claims the lack of site-specific information undercuts public participation and precludes meaningful environmental analysis. We disagree. Sierra Pacific and the Department, faced with the speculative nature of future pesticide use, provided extensive discussions on the potential use of herbicides. These discussions provide the public with pertinent information and reveal the Department carefully considered potential environmental impacts.

Ebbetts Pass suggests "it is conceivable" a site-specific review would lead to a number of reasonable mitigation measures. Ebbetts Pass lists buffer zones around watercourses, preserving large oak trees, limiting applications to allow for understory, limiting application techniques, and limiting the use of the most egregious chemicals.

As Sierra Pacific points out, buffer zones already exist, and it has already committed to leaving large nest trees, maintaining nesting habitat. In addition, Sierra Pacific will use herbicides once or twice at most in the lifetime of a stand. Application techniques and the type of herbicides applied depend on a number of factors, including soil type, survival rates of seedlings, and insect and rodent damage. Therefore, as Sierra Pacific notes, it is not reasonable to limit the types of herbicides or application techniques until after harvesting.

Under the regulations, if an agency finds an impact too speculative, it should note its conclusion and terminate discussion of the impact. (Cal. Code Regs., tit. 14, § 15145.) Here, the Department noted the speculative

---

[9] See footnote 6, *ante*, at page 1352.

nature of potential herbicide use and, instead of pursuing a site-specific discussion, provided an extensive discussion of general herbicide use and attendant impacts. We find the Department proceeded in the manner required by law in assessing the potential impacts of herbicide use. We also find, based on the administrative record, substantial evidence to support the Department's finding of no substantial evidence of significant adverse environmental impacts from the use of pesticides.

## DISPOSITION

The judgment is affirmed. The stays previously ordered are vacated. Sierra Pacific and the Department shall recover costs on appeal.

Sims, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied December 7, 2004, and appellant's petition for review by the Supreme Court was denied February 23, 2005.