Filed 3/6/23  Battle Creek Alliance v. Dept. of Forestry & Fire Protection CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| BATTLE CREEK ALLIANCE et al., | C095091 |
| Plaintiffs and Appellants, | (Super. Ct. No. 20CI000070) |
| v. | |
| DEPARTMENT OF FORESTRY AND FIRE PROTECTION, | |
| Defendant and Respondent; | |
| SIERRA PACIFIC INDUSTRIES, | |
| Real Party in Interest and Respondent. | |

Appellants Battle Creek Alliance and Marily Woodhouse appeal from a judgment after a bench trial denying their petition for writ of mandate and complaint for declaratory and injunctive relief.  Appellants sought to compel defendant and respondent the Department of Forestry and Fire Protection (CalFire) to set aside its approval of the Rio Gatito timber harvest plan and to enjoin respondent and real party in interest Sierra

1

Pacific Industries from engaging in any timber operations under the plan. Appellants also sought a declaratory judgment declaring that CalFire has engaged in a pattern and practice of violating the Z'berg-Nejedly Forest Practice Act, Pub. Resources Code, § 4511 et seq. (Forest Practice Act); its implementing regulations (Cal. Code Regs., tit. 14, § 896 et seq.) (Forest Practice Rules); and the California Environmental Quality Act, Pub. Resources Code, § 21000 et seq. (CEQA) by failing to lawfully assess cumulative water quality and aquatic habitat impacts of timber harvest plans within the Battle Creek watershed.[1] On appeal, appellants argue: (1) CalFire violated CEQA by refusing to consider significant cumulative impacts to salmonids outside the boundaries of its assessment areas for the Rio Gatito timber harvest plan; (2) the plan is inadequate as an informational document with respect to disclosing baseline conditions for and analyzing the cumulative impact to salmonids, sedimentation, and water temperature; and (3) they are entitled to declaratory relief to end CalFire's alleged de facto policy of artificially limiting the scope of its cumulative impact analyses. We will affirm the judgment.

## I. BACKGROUND

A.      *Legal Background*

"The Forest Practice Act requires timber owners or operators on private land to submit a timber harvest plan specific to the site and planned logging activity to [CalFire] for approval before harvesting. (§§ 4581-4582.5.)" (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 943 (*Ebbetts Pass II*).)

A timber harvest plan (THP) must include, among other details, "[a] description of the land on which the work is proposed to be done," "[a]n outline of the methods to be used to avoid excessive accelerated erosion from timber operations to be conducted

_____

[1] Undesignated statutory references are to the Public Resources Code.

2

within the proximity of a stream," "[s]pecial provisions, if any, to protect any unique area within the area of timber operations," "[a] certification by the registered professional forester preparing the plan that [he or she] or a designee has personally inspected the plan area," and "[a]ny other information the [Board of Forestry and Fire Protection] provides by regulation to meet its rules and the standards of this chapter." (§ 4582; see also Cal. Code Regs., tit. 14, § 1034.)

The Forrest Practice Rules contain additional requirements including provisions to protect and maintain watersheds with listed anadromous salmonids.[2] (Cal. Code Regs., tit. 14, § 936 et seq.)

CalFire is the lead agency in the review of timber harvest plans. (Cal. Code Regs., tit. 14, § 1037.5, subd. (c).) CalFire's "approval of timber operations is generally subject to CEQA, but under section 21080.5, the Forest Practice Act's regulatory scheme has been certified for exemption from CEQA's requirements for preparation of an environmental impact report (EIR) before approval of a project." (*Ebbetts Pass II, supra*, 43 Cal.4th at p. 943.) The timber harvest plan serves as the functional equivalent of an EIR. (*Ibid*.) "As in the preparation of an EIR, a timber harvest plan must consider cumulative impacts from the subject harvest together with other operations." (*Ibid*.) The Forest Practice Rules "adopt the CEQA regulations' definition of 'cumulative impacts' from related projects: 'the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually

---

[2] Sierra Pacific Industries requested judicial notice of statements of reasons issued by the Board of Forestry and Fire Protection to show the board's reasons for adopting various amendments to the Forest Practice Rules. We deferred decision on the request pending calendaring and assignment of the panel. We now deny the request because the documents are unnecessary to our resolution of the issues on appeal.

minor but collectively significant projects taking place over a period of time.' " (*Id*. at pp. 943-944; see Cal. Code Regs., tit. 14, §§ 895.1, 15355.)

The Forest Practice Rules "provide that '[c]umulative impacts shall be assessed based upon the methodology described in Board Technical Rule Addendum Number 2 . . . and shall be guided by standards of practicality and reasonableness. The . . . plan submitter's duties under this section shall be limited to closely related past, present and reasonably foreseeable probable future projects within the same ownership and to matters of public record. The Director shall supplement the information provided by the . . . plan submitter when necessary to insure that all relevant information is considered.' (Cal. Code Regs., tit. 14, § 898.)" (*Ebbetts Pass II, supra*, 43 Cal.4th at p. 944.)

Technical Rule Addendum No. 2 requires the preparer of the timber harvest plan to: (1) establish and briefly describe the assessment area and briefly explain the rationale for establishing the assessment area; (2) identify and briefly describe the location of past projects and reasonably foreseeable future projects within the assessment area; (3) determine whether there are any continuing, significant adverse impacts from past land use activities within the assessment areas that may add to the impacts of the proposed project; and (4) determine whether the proposed project, in combination with other projects or reasonably foreseeable future projects, has a reasonable potential to cause or add to significant adverse cumulative impacts. (Cal. Code Regs., tit. 14, § 932.9.)

After CalFire receives a timber harvest plan, it makes the plan available for public inspection and comment. (§ 4582.6, subd. (a).) CalFire "transmits copies of the THP to other agencies, including the Department of Fish and Game and the appropriate Regional Water Quality Control Board, for their review. [Citation.] A representative of the local Regional Water Quality Control Board participates in an interagency team that reviews the THP and assists the Director in evaluating the planned timber operations and their environmental impacts. (Cal. Code Regs., tit. 14, § 1037.5.) The review team may

4

perform a preharvest inspection of the proposed logging site.  (*Id*., subd. (g)(1).)  The review team's chairperson makes a recommendation to the Director regarding whether the plan should be approved or rejected.  (*Id*., subd. (h).)"  (*Pacific Lumber Co. v. State Water Resources Control Bd*. (2006) 37 Cal.4th 921, 931.)

Ultimately, the Director of CalFire determines whether the timber harvest plan "conforms to the Forest Practice Act and the Board of Forestry[ and Fire Protection]'s rules and regulations, taking into account the comments and recommendations that he or she has received."  (*Pacific Lumber Co. v. State Water Resources Control Bd., supra*, 37 Cal.4th at p. 932.)  "[CalFire]'s notice of approval must include a written response to significant environmental issues raised by commenters."  (*Ebbetts Pass II, supra,* 43 Cal.4th at p. 943.)

### B.    *Factual Background*

Sierra Pacific Industries sought approval for the Rio Gatito timber harvest plan covering 822 acres in Tehama County near Mineral.  The plan included clearcutting, commercial thinning, creation of a fuel break, and road construction.  The watercourses within the timber harvest plan area include Panther Creek—a class II watercourse that dries up in the summer—and a number of unnamed class III watercourses that are dry for most of the year.  The confluence of Panther Creek and the South Fork of Battle Creek is one and a half miles west of the timber harvest plan area.  The South Fork then flows another 20 miles to where it merges with the North Fork of Battle Creek to become the main stem of Battle Creek, a tributary of the Sacramento River.

The timber harvest plan describes two assessment areas for purposes of analyzing cumulative impacts:  a watershed assessment area and a biological assessment area.  The planning watershed that makes up the watershed assessment area is the Panther Creek watershed.  The Panther Creek watershed is one of 12 sub-watersheds within the larger Battle Creek watershed.  The Rio Gatito timber harvest plan is located entirely within the 10,991-acre Panther Creek watershed.

5

The biological assessment area consists of the entire timber harvest plan area plus all the land within a one-mile radius from its boundaries. The biological assessment area includes a portion of the South Fork of Battle Creek.

As relevant to this appeal, the registered professional forester conducted a field examination of areas near, and areas with the potential to directly impact, certain watercourse conditions, and designated areas along any Class II watercourses as watercourse and lake protection zones. (See Cal. Code Regs., tit. 14, § 936.4.) The Forest Practice Rules restrict activities that can be conducted in this designated zone. (*Id*., §§ 936.3, 936.4.)

The timber harvest plan found no continuing, significant adverse impacts from past land use activities that may add to the impacts of the proposed project. The plan also found that the proposed project, in combination with past, present, and reasonably foreseeable probable future projects, did not have a reasonable potential to cause or add to significant cumulative impacts with respect to the watershed, soil productivity, recreation, traffic, wildfire risk, or visual, biological, or other resources.

A preharvest inspection was performed, and the review team recommended CalFire approve the Rio Gatito timber harvest plan.

The public comment period ended on February 9, 2020. On April 1, 2020, CalFire issued its notice of approval along with its official response to the significant environmental points raised during the evaluation process.

C.     *Procedural Background*

Appellants filed a petition for writ of mandate and a complaint for declaratory and injunctive relief challenging CalFire's decision to approve the Rio Gatito timber harvest plan. Appellants further alleged that CalFire had engaged in a pattern and practice of failing to adequately study, assess, and mitigate timber harvest plans' cumulative impacts to water quality and aquatic habitation within the Battle Creek watershed.

6

After a bench trial, the court issued a ruling denying the petition for writ of mandate and request for declaratory and injunctive relief.

The court entered judgment against appellants, who thereafter filed a timely notice of appeal.

## II.  DISCUSSION

A.  *Standard of Review*

CalFire's "approval of timber operations is subject to CEQA's standard of judicial review.  [Citations.]  Under that standard, 'the courts' inquiry "shall extend only to whether there was a prejudicial abuse of discretion."  [Citation.]  Such an abuse is established "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." ' " (*Ebbetts Pass II, supra*, 43 Cal.4th at p. 944.)  "We review the record de novo and are not bound by the trial court's conclusions."  (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479.)

The adequacy of the timber harvest plan as an informational document is a separate question from whether substantial evidence supported CalFire's conclusions. (*Joy Road Area Forest & Watershed Assn. v. California Dept. of Forestry & Fire Protection* (2006) 142 Cal.App.4th 656, 676-678.)  Moreover, the adequacy of the timber harvest plan as an informational document is a question we address without reference to CalFire's official response.  (*Id*. at p. 678.)

B.  *Assessment Areas*

Appellants' primary challenge to the approval of the Rio Gatito timber harvest plan is to the selected assessment areas.  They contend "CalFire may not rely on rigid assessment areas to avoid consideration of known cumulative impacts just outside of those areas."  (Emphasis omitted.)  Appellants argue the timber harvest plan's justifications for limiting the scope of its analysis are unavailing.  We disagree.

7

We begin with the standard of review particular to the selection of an assessment area. Appellants cite authority explaining that, in the CEQA context, "[a]n EIR is required to discuss significant impacts that the proposed project will cause in the area that is affected by the project. ([Cal. Code Regs., tit. 14, ]§ 15126.2, subd. (a).) This area cannot be so narrowly defined that it necessarily eliminates a portion of the affected environmental setting." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1216.) Appellants offer what they assert is substantial evidence that listed salmonids in the South Fork area are severely impacted by sedimentation and temperature increases, and that clearcutting is contributing to those impacts. As we will discuss in Part II.D, appellants have not successfully challenged the conclusion that the Rio Gatito timber harvest plan will not contribute to sedimentation and temperature increases.[3] Therefore, appellants have not demonstrated there were significant impacts outside of the assessment area that required broadening the assessment area on that basis. (See Cal. Code Regs., tit. 14, § 15130, subd. (a)(1) ["An EIR should not discuss impacts which do not result in part from the project evaluated in the EIR"].) Rather, they argue substantial evidence of an impact is sufficient because we should apply a "fair argument" test to determine whether a potential impact requires analysis. This is incorrect. Appellants' reliance on *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383 for this point is

---

[3] CalFire's official response also explained that "while the presence of impacts to the lower reaches of Battle Creek are well documented, pinning these impacts solely on timber harvesting and specifically evenage management is not supported by the record. The significant post-fire sedimentation impacts from the Ponderosa Fire make attribution to a specific source problematic. This is in addition to the many other potential sources which have been identified other than timber harvesting . . . . The contribution that any timber harvesting would have on downstream resources is purely speculative under these circumstances." Appellants do not demonstrate this conclusion was not supported by substantial evidence.

8

misplaced. The appellate court in *Friends of the Old Trees* explained that the decision not to require a timber harvester to prepare a cumulative impacts analysis at all is governed by the "fair argument" test. (*Id.* at p. 1397.) This test is inapplicable because a cumulative impacts analysis was prepared. The fair argument test does not apply to the selection of assessment areas. Rather, "[t]he selection of the assessment area is left to the Department's expertise, and absent a showing of arbitrary action, we must assume the Department exercised its discretion appropriately." (*Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1351 (*Ebbetts Pass I*).)

Technical Rule Addendum No. 2 requires the preparer of a timber harvest plan to establish and briefly describe the assessment area and briefly explain the rationale for establishing the assessment area. (Cal. Code Regs., tit. 14, § 932.9.)[4]

The Forest Practice Rules define a "planning watershed" as "the contiguous land base and associated watershed system that forms a fourth order or other watershed typically 10,000 acres or less in size. Planning Watersheds are used in planning forest management and assessing impacts. The Director has prepared and distributed maps identifying Planning Watersheds Plan submitters must use. Where a watershed exceeds 10,000 acres, the Director may approve subdividing it. Plan submitters may propose and use different Planning Watersheds, with the Director's approval." (Cal. Code Regs., tit. 14, § 895.1.) The Rio Gatito timber harvest plan explains that the 10,991-acre Panther Creek watershed was chosen as the watershed assessment area "because it represents a

---

[4] Similarly, under CEQA regulations, "[l]ead agencies should define the geographic scope of the area affected by the cumulative effect and provide a reasonable explanation for the geographic limitation used." (Cal. Code Regs., tit. 14, § 15130, subd. (b)(3).) "Neither CEQA case law nor the agency's own rules require it to adopt and apply an invariable rule or procedure for determining the size of a watershed assessment area." (*East Bay Mun. Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1128.)

distinct hydrological unit and suits the scale of the proposed timber operations." The proposed timber operations covered 822 acres. Further, the "boundaries were selected in order to evaluate the potential cumulative impacts of other projects occurring in the drainage in combination with the proposed THP. The rationale for using these planning watersheds is that it represents the natural collector of potential water quality impacts, *since if they exist*, [they] will accumulate in the watercourses that define the planning watershed." (Italics added.)

The Forest Practice Rules also provide that timber harvest plans "shall be considered in the context of the larger forest and Planning Watershed in which they are located, so that biological diversity and watershed integrity are maintained within larger planning units and adverse Cumulative Impacts, including impacts on the quality and Beneficial Uses of water are reduced." (Cal. Code Regs., tit. 14, § 897, subd. (b)(2).) The chosen biological assessment area was 11,060 acres. It consisted of the Rio Gatito timber harvest plan area plus all the land within a one-mile radius of its boundaries. This assessment area was chosen because it was "large enough to capture potential cumulative effects, yet not so large as to dilute or render potential effects of the project undetectable. Clearly within this area, there are subunits such as the biological assessment area for salmonids . . . ."

CalFire did not abuse its discretion in approving either the watershed or biological assessment area. A showing was made to support the selected assessment areas under the relevant laws. This was not true of the authorities relied upon by appellants. (See *Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 107 ["A lead agency cannot ignore a project's expected impacts merely because they occur, as Sierra Watch puts it, 'outside an arbitrary radius' "]; *Bakersfield Citizens for Local Control v. City of Bakersfield, supra*, 124 Cal.App.4th at p. 1216 ["The EIR's state what has been determined to be the appropriate geographic area for each category of potential impacts, but no explanation was offered as to the criterion upon which this determination was made"]; *Kings County*

10

*Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 721-724 [respondent agreed to California Air Resources Board's recommendation to analyze the entire San Joaquin Valley Air Basin but analyzed a smaller area apparently without explanation]; *Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 430 ["The EIR relies wholly upon the earlier [air quality management plan] analysis which admittedly excluded outer continental shelf data from its evaluation" and "does not explain in even minimum detail the basis for the omission and provides no reasoned analysis clarifying why complete reliance on [the air quality management plan] is justified when this major omission exists"].) We reject appellants' challenges to the assessment areas. As we will discuss, this conclusion has repercussions for appellants' remaining claims regarding the adequacy of the timber harvest plan as an informational document.

C.      *Disclosure of Baseline Conditions*

"To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315.) A timber harvesting plan must include "[a] general description of physical conditions at the Plan site, including general soils and topography information, vegetation and stand conditions, and watershed and Stream conditions." (Cal. Code Regs., tit. 14, § 1034, subd. (gg).) Under CEQA regulations, "[a]n EIR must include a description of the physical environmental conditions in the vicinity of the project. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to provide an understanding of the significant effects of the proposed project and its alternatives." (*Id*., § 15125, subd. (a).) As this court recently explained, "[t]he scope and detail of an EIR's discussion of the regional environmental setting is driven by the scope and extent of the

11

project's potential impacts. . . . The environment to be considered is 'the area in which significant effects would occur either directly or indirectly as a result of the project.' ([*Id*., ]§ 15360.) The description must allow the reader to assess and analyze the project's potential impacts." (*League to Save Lake Tahoe Mountain etc. v. County of Placer* (2022) 75 Cal.App.5th 63, 92.) Additionally, "an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review . . . for support by substantial evidence." (*Communities for a Better Environment v. South Coast Air Quality Management Dist., supra*, at p. 328.)

Appellants argue the timber harvest plan fails to adequately disclose existing baseline conditions for salmonids, water temperature, and sedimentation. We reject each of these contentions as set forth below.

1.      *Salmonids*

The timber harvest plan noted the South Fork of Battle Creek is known to support runs of Chinook and steelhead salmon and that the entire plan area "will be afforded Anadromous Salmonid Protections" under California Code of Regulations, title 14, section 936.9. Appellants argue this description is inadequate because it provides no information regarding these salmonid populations or their health. We conclude the timber harvest plan adequately disclosed relevant baseline conditions.

The timber harvest plan includes additional information about salmonid in the South Fork of Battle Creek. It references a 2017 survey that it describes as showing improved salmonid habitat conditions in the South Fork downstream of the watershed assessment area. More importantly, as part of the review process, the Department of Fish and Wildlife provided a report to CalFire on potential cumulative impacts towards fish and wildlife resources. The report explains that the presence of multiple fish barriers downstream from the assessment area precludes the distribution of anadromous fish within that portion of the watershed. For this reason, appellants' assertion that the timber

12

harvest plan failed to comply with California Code of Regulations, title 14, section 936.9, subdivision (b) fails. That provision states: "[p]re-plan adverse cumulative watershed Effects on the populations and habitat of anadromous salmonids shall be considered. The Plan shall specifically acknowledge or refute that such Effects exist. When the proposed Timber Operations, in combination with any identified pre-plan watershed Effects, will add to significant adverse existing cumulative watershed Effects, the Plan shall set forth measures to effectively reduce such Effects." This provision does not apply to watersheds that do not have listed anadromous salmonids. (Cal. Code Regs., tit. 14, § 936.9.) California Code of Regulations, title 14, section 936.9 imposes requirements on "any watershed with listed anadromous salmonids." (*Ibid*.) "[S]ubsections (k)-(q) also apply to Planning Watersheds immediately upstream of, and contiguous to, any watershed with listed anadromous salmonids for purposes of reducing significant adverse impacts from transported fine sediment." (*Ibid*.) Subdivision (b), however, does not. (*Ibid*.) Sierra Pacific Industries argues based on the record, and appellants do not dispute, that the nearest salmonids are 18 miles downstream from the Rio Gratito timber harvest plan. Consequently, to the extent it did not, there was no need for the plan to specifically acknowledge or refute pre-plan adverse cumulative effects on a non-existent salmonid population and habitat.

Appellants criticize the Department of Fish and Wildlife report for providing no information on the downstream condition of salmonids yet acknowledge that the only part of the South Fork in the biological assessment area is *upstream* of Panther Creek and therefore unaffected by project runoff. As such, their argument that additional information regarding the downstream condition of salmonids was necessary to adequately disclose the existing baseline conditions fails with their earlier attacks on the assessment areas because the timber harvest plan did not conclude there were any potential downstream effects. (Cf. *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236 ["[The Department of] Fish and Game had reasonably determined that the

13

proposed timber harvest could have a significant adverse effect on the old-growth-dependent wildlife habitat. Therefore, the board, through the department, had an obligation imposed by CEQA to collect information regarding the presence of old-growth-dependent species on the site of the proposed timber harvest"].)

     2.     *Water Temperature*

Appellants argue the timber harvest plan is inadequate as an informational document because it does not contain any description of baseline water temperatures for either Panther Creek or the South Fork. The timber harvest plan describes the causes of water temperature effects and concludes none will occur. The plan also explains that Sierra Pacific Industries monitors water temperature in a number of watercourses in Tehama and Shasta counties. On this record, we cannot conclude the timber harvest plan was deficient for informational purposes merely because it did not include historical data regarding water temperature. Appellants' brief argument on this point cites no authority supporting the requirement of this specific information, nor have we found any. In the CEQA context, we have explained that the description of baseline conditions "must allow the reader to assess and analyze the project's potential impacts." (*League to Save Lake Tahoe Mountain etc. v. County of Placer, supra*, 75 Cal.App.5th at p. 92; see also Cal. Code Regs., tit. 14, § 15125, subd. (a) ["The description of the environmental setting shall be no longer than is necessary to provide an understanding of the significant effects of the proposed project and its alternatives"].) Relatedly, "[n]oncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. (§ 21005, subd. (b).) . . . '[A] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391.) Here, no prejudice can be shown because it does not appear that relaying specific data regarding water temperature was necessary to analyze whether the timber harvest plan would

14

*increase* temperatures. The plan explained that it would not create temperature effects and "[t]he observed canopy closure along the stream reaches appeared to be adequate to maintain or *improve* water temperatures suitable for aquatic species and downstream fisheries." (Italics added.) As such, temperature data was not needed for a reader to be able to assess the project's potential impacts, and we must reject this challenge to the timber harvest plan's description of baseline conditions.

      *3.     Sediment*

With respect to sediment effects, the timber harvest plan states:

"Current sediment conditions within the watershed were observed during THP preparation. The results of these observations did not indicate that any of the commonly found characteristics associated with high levels of sediment delivery . . . were present at levels of significance to cause concern. Additionally, a 2017 snorkel survey by [U.S. Fish and Wildlife Service] showed improving salmonid habitat conditions and significant decreases in fine sediment levels in the South Fork of Battle Creek downstream of the Watershed Assessment Area; indicating signs of recovery from the effects of the 2012 Ponderosa Fire.

"Cumulative effects to sediment conditions from past activities within the THP area are negligible. Clearcut areas from past projects show no signs of having any significant adverse sediment effects. This observation is consistent with the results of a multi-agency field assessment of sediment delivery from clearcut harvests conducted in the Battle Creek watershed . . . in 2011. The report summarizing the field assessment (which covered 16 miles of riparian buffers directly adjacent to clearcuts) states, 'Overall, the Task Force saw no significant direct water quality impact related to clearcut harvesting in the assessment area.' "

Appellants argue this discussion is inadequate because it is based on observations and contains no citation to any survey or report that supports these conclusions, and the record does not indicate where or when these observations were made, by whom, and

15

with what credentials. Pursuant to the Forest Practice Act, the timber harvest plan was submitted by a registered professional forester who also certified that he or his supervised designee personally inspected the plan area. (§ 4582, subd. (h).) Additionally, the preharvest inspection report concluded that the timber harvest plan accurately described the physical condition at the plan site, including soils, watershed, and stream conditions. Appellants have not demonstrated that relying on these inspections was improper.

Furthermore, we conclude the surveys and reports cited in the timber harvest plan support its description of baseline conditions. Appellants argue the full conclusion set forth in the 2011 assessment undermines the timber harvest plan's assertion that impacts from past logging projects are negligible: "Overall, the Task Force saw no significant direct water quality impact related to clearcut harvesting in the assessment area. Most observed timber-harvest-related water-quality impacts were found to be associated with publicly and privately managed roads. These roads are used for all types of timber harvesting in the watershed, whether clearcutting, selection, or some intermediate silvicultural method. Due to the limited time period of the assessment, the Task Force was unable to evaluate the potential for indirect water quality impacts that may result from clearcut harvesting (such as possible increases in suspended sediment and turbidity associated with logging-induced increases in peak flows)." The timber harvest plan explained that this assessment was consistent with its observations and accurately stated the ultimate conclusion.

The 2017 Battle Creek survey explained that "[d]uring the 2015 and 2016 spawning seasons, a large increase in fine sediment was observed inundating holding pools and covering up spawning habitat in the South Fork and stretching a few miles down in to the main stem" but "[t]his season we noted that most of these fine[ sediments] have moved out of the South Fork" though "the movement of fine sediments has now stretched throughout the entire main stem and all the way to the mouth of Battle Creek." The timber harvest plan's statement that this survey showed improved conditions is

16

accurate.  Additionally, the assessment areas did not include all of Battle Creek.  Thus, the surveys and reports cited in the timber harvest plan were supportive of the results of the inspections of the timber harvest plan area but their conclusions about areas outside of the assessment areas are not controlling.  The timber harvest plan adequately disclosed baseline sediment conditions in the assessment areas.

D.      *Cumulative Impact Analysis*

Appellants argue the timber harvest plan did not properly analyze cumulative impacts, rendering it inadequate as an informational document.

Technical Rule Addendum No. 2 requires the preparer of the timber harvest plan to determine:  (1) whether there are any continuing, significant adverse impacts from past land use activities within the assessment areas that may add to the impacts of the proposed project; and (2) whether the proposed project, in combination with other projects or reasonably foreseeable future projects, has a reasonable potential to cause or add to significant adverse cumulative impacts.  (Cal. Code Regs., tit. 14, § 932.9.)  The ultimate question in a challenge to a cumulative impact analysis as an informational document is whether the timber harvest plan "includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'  [Citations.]  The inquiry presents a mixed question of law and fact.  As such, it is generally subject to independent review.  However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference.  [Citations.]  Thus, to the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted."  (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516.)

"[T]he cumulative impact analysis must be substantively meaningful.  ' "A cumulative impact analysis which understates information concerning the severity and

17

significance of cumulative impacts impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval. [Citation.]" [Citation.] [¶] While technical perfection in a cumulative impact analysis is not required, courts have looked for "adequacy, completeness, and a good faith effort at full disclosure." ' " (*Joy Road Area Forest & Watershed Assn. v. California Dept. of Forestry & Fire Protection, supra*, 142 Cal.App.4th at p. 676.) "The purpose of requiring a cumulative-impacts analysis in a timber harvest plan under the Forest Practice Act, as in an EIR under CEQA, is to ensure that the public and decision makers receive full information before the project is approved, not to set procedural traps for plan preparers or [CalFire]." (*Ebbetts Pass II, supra*, 43 Cal.4th at p. 950.)

Appellants argue that a "pervasive flaw" in the timber harvest plan is its assumption that if a project's impact is not significant when considered individually, that impact will not be cumulatively significant. We conclude no such flaw exists. The timber harvest plan includes a cumulative impacts analysis that tracks the requirements of Technical Rule Addendum No. 2 for part of its more than 100 pages. The timber harvest plan specifically concluded there were no continuing, significant adverse impacts from past land use activities that might add to the impacts from the proposed project and that the proposed project, in combination with past, present, and reasonably foreseeable probable future projects, did not have a reasonable potential to cause or add to significant cumulative impacts in any resources subjects. We now turn to appellants' challenges to specific portions of the cumulative impact analysis.

1.    *Salmonid*

As set forth above, the cumulative impacts analysis explained that the entire timber harvest plan area "will be afforded Anadromous Salmonid Protections" under California Code of Regulations, title 14, section 936.9. Under CEQA regulations regarding the discussion of cumulative impacts, "[a] project's contribution is less than

18

cumulatively considerable if the project is required to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact." (Cal. Code Regs., tit. 14, § 15130, subd. (a)(3).) Additionally, the timber harvest plan was supplemented by the report prepared by the Department of Fish and Wildlife regarding potential cumulative impacts towards fish and wildlife resources. The report explains that the presence of multiple fish barriers downstream from the assessment area precludes the distribution of anadromous fish within that portion of the watershed.

Appellants nonetheless argue the timber harvest plan lacked any analysis of the cumulative impacts to salmonids because there is no disclosure of the current threats to downstream salmonids from sedimentation and temperature increases, no discussion of the past, present, and potential future sources contributing to those impacts, and no attempt to understand the project's incremental contribution to those impacts.

Downstream portions of the South Creek are not part of any assessment area, and we have already rejected appellants' challenges to the assessment areas. Furthermore, as we have discussed, salmonids are outside of the watershed assessment area and thus appellants' assertion that the timber harvest plan failed to comply with California Code of Regulations, title 14, section 936.9, subdivision (b) fails.

Additionally, *Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, cited by appellants, is inapplicable. There, CalFire took the position that it did not have to consider the cumulative impact in the evaluation of a timber harvest plan, and explained in its response to public comment that " '[t]o address the cumulative effect issue the Department has taken the tact [*sic*] that if the adverse effects are minimized to the maximum on each individual operation, then the total effect in the surrounding area will also be minimized to an acceptable level.' " (*Id*. at pp. 624-625.) CalFire has not taken that position in this case. Rather, CalFire has concluded there will be no reasonably significant effects to salmonids or the watershed. To the extent appellants' argument regarding the cumulative impact analysis regarding

19

salmonids is an attack on the cumulative impact analyses regarding water temperature increases and sedimentation, we will now turn to those analyses.

2.      *Water Temperature*

The timber harvest plan's analysis of water temperature effects included the following discussion: "Water temperature effects are changes in water chemistry or changes in biological properties caused by the combination of solar warmed water from two or more locations where natural cover has been removed. The riparian areas along the watercourses in this THP are densely vegetated with a mix of tree species (mostly conifer) of varying age class, and brush. [¶] The high specific heat of water requires significant solar radiation input over a long section of stream to adversely affect the temperature. Generally in mountainous-forested regions, water in the streams typically has minimal residence time within a [watercourse and lake protection zone] to receive a heighted level of solar radiation. No trees will be harvested within any [watercourse and lake protection zone] in this THP; therefore, no significant impacts are anticipated to occur." Elsewhere, the timber harvest plan explained that "[n]ear-water vegetation provides many habitat benefits including shade and nutrients. The observed canopy closure along the stream reaches appeared to be adequate to maintain or improve water temperatures suitable for aquatic species and downstream fisheries. Within the lower reaches large streams confined to bedrock channels have lesser amounts of near water vegetation."

Appellant argues this analysis fails to include any discussion of the cumulative temperature problem in the South Fork or any information on existing temperatures in Panther Creek or its tributaries. Only an upstream portion of the South Fork was inside an assessment area and appellants have failed to demonstrate additional detail was necessary for an adequate discussion of temperature effects.

Appellants assert the cumulative impact analysis fails to contain any description of the waterways within the project site that would be impacted by shade tree removal, or

20

any analysis of the potential impacts of that shade tree removal on water temperature. We disagree that the discussion was insufficient. Appellants note the timber harvest plan permits harvesting along Class III watercourses because the watercourse and lake protection zone is along Class II waterways. The record demonstrates the Class III waterways in the assessment area were dry most of the year. The plan also limits the use of heavy equipment associated with timber operations in these areas. (See Cal. Code Regs., tit. 14, § 895.1 [defining "Equipment Limitation Zone"].) Given this evidence and the timber harvest plan's explanation that significant solar radiation input over a long section of stream is required for adverse temperature impacts, we conclude the plan's analysis of temperature effects was adequate without further discussion of the potential impact from shade tree removal in areas surrounding the Class III waterways. Additionally, the timber harvest plan was permitted to consider mitigation measures. (Cal. Code Regs., tit. 14, § 15130, subd. (a)(3).)

We conclude the plan "include[d] ' " 'detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' " (*Sierra Club v. County of Fresno, supra*, 6 Cal.5th at p. 516.)

### 3. *Sediment*

Appellants argue the timber harvest plan ignores the "overwhelming evidence in the record that increases in sedimentation are wreaking havoc on salmonid habitat in Battle Creek, especially in the South Fork." To support this contention, they repeat the assertions we rejected in the context of their challenge to the description of baseline conditions.

Appellants dispute the timber harvest plan's assertion that the plan to abandon 5,700 feet of existing roads within the [watercourse and lake protection zone] would reduce sedimentation on the basis that the project would also construct 8,000 feet of new roads. We are unpersuaded: 7,500 feet of the 8,000 feet of new road construction is

21

relocation of 5,700 feet of existing roads that are poorly designed and hydrologically connected to watercourses. The timber harvest plan explained "[n]o additional mitigation for building these roads is necessary. The act of relocating and abandoning the [watercourse and lake protection zone] roads will be a significant watershed improvement. As per the road construction requirements within the plan, all new roads shall be adequately drained and hydrologically disconnected." " 'Hydrologic Disconnection' means the removal of direct routes of drainage or overland flow of road runoff to a Watercourse or Lake." (Cal. Code Regs., tit. 14, § 895.1.)

The timber harvest plan explains that "[e]rosion hazard ratings present within the THP area are Low and Moderate. Watercourses within the plan area have peak flows in early spring when rain on snow events occur and have lower flows or are drying during the summer and fall months. Winter period operations will only be conducted during extended dry periods . . . or when hard frozen conditions exist to mitigate any erosion potential. Surface rocking and the planned installation of rolling dips will lessen the potential for overtopping and sediment input where seasonal roads cross watercourses. [¶] The placement, timing and spacing of erosion control facilities, lopping of tops, spreading of slash, and the continued maintenance of the existing road system within the plan area will reduce the impacts of concentrated runoff during peak flows." Appellants argue the timber harvest plan "makes no attempt to determine whether, after applying [best management practices], sediment discharges from the Project would be *cumulatively considerable* in light of the severe sedimentation problems in the South Fork." Again, the entire South Fork is not in the assessment areas. We disagree with any suggestion that the timber harvest plan did not analyze whether sediment discharges would be cumulatively considerable. Rather, it concluded they were not and appellants have failed to demonstrate the discussion was inadequate for informational purposes.

*E.*     *Declaratory Relief*

Appellants argue they are entitled to declaratory relief.  They contend they demonstrated "based on 10 THPs previously approved by CalFire, including the seven most recent THPs in the Battle Creek watershed—that CalFire has consistently taken the unlawful position that compliance with the generic [best management practices] required by the [Forest Practice Rules] automatically means the THP will not contribute to any downstream cumulative impacts, and that it is unnecessary to consider impacts beyond the planning watersheds, even when presented with substantial evidence that such impacts are occurring."  In its ruling, the trial court explained that appellants listed a series of projects that were subject to a timber harvest plan to support this conclusion.  The court noted appellants do not cite to any instance where a tribunal had found the project to be contrary to law.  Then, the court explained that "[u]ntil such time as the Legislative or Executive branch requires more than [] what is currently deemed reasonable or what is required in the [Forest Practice Rules], the Court can only apply the existing standards that exist by way of regulation, statute or prior case law."  Appellants suggest the trial court never considered their evidence because they did not show any of the projects had been found contrary to law by a different tribunal.  In fact, the trial court found that appellants had not shown any of the projects were contrary to law.  Appellants have failed to demonstrate any error in this conclusion.  The authorities relied upon by appellants are unavailing.  In *Californians for Native Salmon etc. Assn. v. Department of Forestry* (1990) 221 Cal.App.3d 1419, the appellate court held that a demurrer was erroneously sustained to plaintiffs' claim for declaratory relief where they had alleged CalFire failed to evaluate and respond to public comments and to assess cumulative impacts.  (*Id*. at pp. 1422, 1424.)  That is not, as appellants indicate, the claim being made here.  Here, appellants disagree with how CalFire has assessed those impacts, but they have not met their burden to prove that CalFire engages in policies that violate any applicable law.  (See *id*. at p. 1430 ["Appellants have alleged policies which impact on

23

each THP approval; they will either meet their burden of proof that respondents engage in policies which violate the statutory or decisional law of this state, or they will not"]; see also *Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1566 ["Declaratory relief has been held to be the proper remedy when it is alleged an agency has a policy of ignoring or violating applicable laws"].)  We therefore reject appellants' assertion that they are entitled to declaratory relief.

## III.  DISPOSITION

The judgment is affirmed.  Respondents CalFire and Sierra Pacific Industries shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

_____
RENNER, Acting P. J.

We concur:

/S/

_____
EARL, J.

/S/

_____
HOCH, J.*

_____

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.